# *In re* LIC. CARMELO ÁVILA, JR., querellado.

*Número:* O-77-234          *Resuelto:* 28 de febrero de 1980

*Héctor A. Colón Cruz, Procurador General,* y *Eliadís Orsini Zayas, Procuradora General Auxiliar,* abogados de El Pueblo; *Luis R. Polo* y *Vicente Ortiz Colón,* abogados del querellado.

PER CURIAM:   El minucioso Informe suscrito y rendido a este Tribunal por el Comisionado Especial Lic. Miguel A. Velázquez Rivera, consigna como hechos no contradichos los siguientes:

"[I]

1. El querellado, Carmelo Avila, Jr., es un abogado dedicado al ejercicio privado de su profesión, habiendo sido admitido a ejercer en Puerto Rico el 24 de noviembre de 1970.

2. Durante el año 1973 el querellado tenía su bufete profesional establecido en la ciudad de San Juan. En uno de los primeros días de ese año, recibió en su oficina, la visita de la Sra. Amparo M. Camerón, a quien el querellado no había conocido anteriormente. Doña Amparo informó al querellado que ella había sido demandada judicialmente ante la Sala de San Juan del Tribunal Superior, en reclamación de los daños y perjuicios que se alegaba que ella había causado a los esposos Jorge de Juan y Mercedes Torres de Juan, al intervenir en un accidente de automóviles. Inquirió del letrado sobre la disponibilidad de éste para representarla en la acción judicial.

3. El querellado accedió al requerimiento de su visitante. En consecuencia, mediante acuerdo verbal se convino que el querellado asumiría la representación legal de la Sra. Camerón—demandada en aquel procedimiento—y que ésta pagaría al letrado la suma total de $240.00 por sus servicios profesionales.

4. En efecto, el querellado representó legalmente a la Sra. Camerón en el caso civil de daños y perjuicios ante el Tribunal Superior de San Juan. Eventualmente el magistrado que presidió la audiencia dictó sentencia declarando con lugar la reclamación de los demandantes contra doña Amparo, pero limitando a la suma de $1,800.00 la cuantía que ésta debía satisfacer para compensar los daños y perjuicios sufridos por los esposos demandantes.

5. Los esposos de Juan no estuvieron conformes con la sentencia dictada por el Tribunal Superior y, en razón de ello, instruyeron a su abogado para que iniciara los trámites legales pertinentes para que la sentencia pudiera ser revisada por un tribunal de superior jerarquía. Poco después, el abogado de los esposos demandantes en el pleito notificó telefónicamente al querellado Carmelo Avila, Jr. las instrucciones que había recibido de sus clientes y su intención de tramitar la revisión de la sentencia.

6. Así las cosas, el querellado decidió comunicarse por escrito con la Sra. Camerón. Le informó que debía pasar a verle. En efecto, el 2 de julio de 1973 la Sra. Camerón se reunió con el Licenciado Avila, Jr. en la oficina de éste. Durante la entrevista el querellado puso en conocimiento de doña Amparo los detalles relacionados con la sentencia dictada por el magistrado que había entendido en el

caso, incluyendo el hecho de que había limitado a $1,800.00 la suma total por la cual ella debía responder. Al propio tiempo, le notificó que la parte adversa estaba sumamente insatisfecha por el resultado del proceso ya que consideraba ridículamente baja la cuantía fijada por el tribunal en su sentencia. Le indicó, además, que el abogado de la parte demandante en el pleito civil le había notificado telefónicamente su intención de recurrir al Tribunal Supremo y solicitar la revisión de la cuantía concedida en concepto de indemnización. Doña Amparo, por su parte, expresó al querellado que ella también estaba insatisfecha con la sentencia dictada por el magistrado del Tribunal Superior y tenía sumo interés, no sólo en oponerse a las pretensiones de los demandantes en su recurso de Revisión, sino en que se revisara aquella parte de la sentencia que le imponía a ella responsabilidad frente a los esposos de Juan.

7. El querellado contestó a la Sra. Camerón que él la había representado en el litigio que se había ventilado ante el Tribunal Superior a cambio de una suma de dinero que él consideraba extremadamente baja y que, como condición para continuar representándola en la etapa apelativa del procedimiento ante el Tribunal Supremo, ella debía comprometerse a satisfacerle $500.00 en concepto de honorarios. En ese momento, doña Amparo se mostró indecisa con respecto a la propuesta. Indicó al querellado que, en todo caso, su decisión estaría sujeta a la posibilidad de que sus hijos la ayudaran económicamente. El querellado entonces le hizo entrega a la Sra. Camerón del expediente relacionado con el caso que él conservaba en su oficina y le indicó que si no conseguía el dinero para satisfacer el importe de honorarios profesionales que él había fijado, debía buscar ayuda legal en las oficinas regionales de la Sociedad para Asistencia Legal, ubicadas en la Calle Loíza de Santurce. Al momento de despedirse el querellado apercibió a la Sra. Camerón que ella tendría que hacer 'algo' con la casa de su propiedad en la cual ella residía, porque, de lo contrario, se la podían 'quitar'.

8. La semana siguiente a la entrevista la Sra. Camerón visitó nuevamente la oficina del querellado. No pudo verlo porque el Licenciado Avila, Jr. no estaba en su bufete. En consecuencia, doña Amparo no prestó ulterior atención al asunto ni gestionó los servicios profesionales de ningún otro abogado.

9. El 12 de julio de 1973 el abogado que representaba a los esposos de Juan en el pleito de daños y perjuicios radicó un recurso de Revisión ante el Tribunal Supremo de Puerto Rico bajo el

número 73-213, impugnando la cuantía concedida a sus representados en la sentencia que había dictado el Tribunal Superior. El querellado fue notificado con copia del recurso de Revisión, en su carácter de abogado de récord de doña Amparo. El Licenciado Avila, Jr., sin embargo, no notificó a la señora Camerón del hecho de haberse radicado el recurso de Revisión ni radicó escrito alguno ante el Tribunal Supremo oponiéndose a las pretensiones de la parte recurrente.

10. El 9 de agosto de 1973 el Tribunal Supremo de Puerto Rico emitió Resolución en el recurso de Revisión que, bajo el número 73-213, habían radicado los esposos de Juan. En su Resolución, el Tribunal Supremo concedió un término de quince días a la recurrida Amparo M. Camerón para que compareciera a mostrar las causas por las cuales no debía aumentarse de $1,500.00 a $5,000.00 la cuantía fijada por el tribunal sentenciador a favor de Mercedes Torres de Juan y de $300.00 a $1,000.00 la concedida a Jorge de Juan por el tribunal de instancia.

11. Copia de la Resolución dictada por el Tribunal Supremo fue notificada al querellado, en su carácter de abogado de doña Amparo M. Camerón. El Licenciado Avila, Jr. no compareció ante el Tribunal Supremo de Puerto Rico a mostrar las causas por las cuales no debía aumentarse la cuantía de la indemnización fijada por el tribunal de instancia. Tampoco se comunicó con la Sra. Camerón para enterarla de la Resolución dictada por la Corte ni compareció en autos para informar al Tribunal Supremo que él no era, en aquel momento, el representante legal de doña Amparo.

12. Durante la audiencia celebrada ante el Comisionado suscribiente el querellado intentó justificar su inacción explicando que él entendía que su relación profesional con la Sra. Camerón había terminado desde el 2 de julio de 1973, al momento en que ella recibió, de manos del querellado, el expediente de su caso. El Comisionado que suscribe no abriga la mínima duda, a base de la prueba aportada, de que—independientemente de la corrección de sus actuaciones—el querellado efectivamente tenía, en ese momento, la creencia subjetiva de que él había dejado de ser el abogado de doña Amparo desde el momento en que habían sostenido la última entrevista.

13. Finalmente, el 10 de septiembre de 1973 el Tribunal Supremo de Puerto Rico dictó sentencia en el recurso de Revisión 73-213 de Mercedes Torres y Jorge de Juan v. Amparo M. Camerón.

En síntesis, el Tribunal confirmó la sentencia original del Tribunal recurrido pero aumentó a $6,000.00 la cuantía de la indemnización que la Sra. Camerón debía pagar para resarcir los daños y perjuicios que había causado a la parte demandante. El querellado fue oportunamente notificado con copia de la Sentencia dictada por el Tribunal Supremo.

14. La Sra. Camerón estaba ajena a lo que estaba ocurriendo. Por una parte, ella no había prestado mayor atención al asunto, convencida como estaba de la justicia de su posición que rechazaba la posibilidad de que, habiendo sido exonerada de responsabilidad en la acción penal proveniente del accidente de automóviles en que las partes en litigio habían intervenido, pudiera imponérsele alguna obligación civil con respecto a los hechos previamente adjudicados. Por otra parte ni el querellado ni ninguna otra persona o autoridad judicial, le había notificado la existencia de trámite procesal alguno con posterioridad a la entrevista sostenida el 2 de julio de 1973 en las oficinas del abogado querellado.

15. Mientras tanto, el abogado de la parte adversa a la Sra. Camerón había continuado con los trámites conducentes a la ejecución de la sentencia dictada por el Tribunal Supremo y la cual, con el transcurso del tiempo, había advenido firme. Eventualmente, el Tribunal Superior de San Juan ordenó que, para satisfacer el importe de la sentencia, se vendiera en pública subasta la casa residencia de la Sra. Camerón. La subasta se fijó para el 18 de marzo de 1974.

16. Días antes de la fecha señalada para la subasta doña Amparo recibió la visita de una hija suya. Esta traía consigo un ejemplar de un periódico en el cual aparecía el edicto correspondiente a la venta pública de la casa residencia de su señora madre. Al tener conocimiento de lo que estaba aconteciendo, doña Amparo—sumamente nerviosa—inició gestiones para evitar ser desposeída de su vivienda. De inmediato visitó la oficina del magistrado del Tribunal Superior que había intervenido en los procedimientos. Como consecuencia de la orientación que allí recibió se trasladó al edificio del Colegio de Abogados de Puerto Rico en busca de ayuda. Una vez allí tuvo oportunidad de entrevistarse con una abogada que ese día estaba encargada de prestar ayuda legal a las personas que a esa institución comparecieran en procura de consejo legal.

17. Al ser informada que la subasta se celebraría la siguiente semana, la abogada recomendó a la Sra. Camerón que tratara de entrevistarse con el Alguacil del Tribunal Superior o con el

abogado de la parte contraria en busca de una fórmula satisfactoria para evitar la venta en pública subasta. Ante el apremio que para ella constituía el hecho de que la venta se efectuaría el siguiente lunes, doña Amparo visitó el sábado de esa semana las oficinas del abogado que representaba a la parte adversa en la acción de daños y perjuicios. Luego de esa visita surgió la posibilidad de que la Sra. Camerón pudiera obtener un préstamo de una compañía financiera; satisfacer el importe de la sentencia y evitar su ejecución sobre el bien inmueble que constituía su residencia.

18. Eventualmente, doña Amparo se trasladó a las oficinas de un ciudadano que ella identificó como abogado retirado y una vez allí se hicieron los trámites pertinentes para que una compañía financiera expidiera un cheque por la suma de $10,000.00 a favor de la Sra. Camerón. Ésta lo endosó y, en adición, suscribió documentos comprometiéndose a pagar el importe del préstamo, más los intereses fijados por la compañía. Con el dinero así obtenido se satisfizo el importe de la sentencia que había sido dictada contra doña Amparo por el Tribunal Supremo de Puerto Rico y se canceló la subasta pública previamente señalada.

19. Doña Amparo estaba sumamente perturbada por lo acontecido. Días más tarde se personó a la Secretaría del Tribunal Superior de San Juan y obtuvo copia de los documentos pertinentes al caso civil de daños y perjuicios que los esposos de Juan habían radicado contra ella. Con los documentos en su poder se personó a la oficina del querellado Lcdo. Avila, Jr., a quien increpó duramente. Entre otras cosas le dijo: 'Lo que usted me hizo, no se le hace a persona humana.'

En adición, doña Amparo exigió del letrado querellado que le hiciera entrega de los documentos relacionados con su caso que el letrado tuviese en su poder. El querellado accedió prontamente a ello. Entre los documentos que la Sra. Camerón recibió de manos del querellado en esta ocasión se encontraban copias tanto de los escritos radicados ante el Tribunal Supremo como de las resoluciones emitidas por dicha Superioridad en el referido caso.

20. Esa fue la última vez que el letrado querellado y la Sra. Camerón se entrevistaron en relación con los hechos en disputa. Ella llevó los documentos a la Oficina del Procurador General de Puerto Rico y radicó la queja que dio lugar al procedimiento de epígrafe.

[II]

21. Mientras tanto, en enero de ese mismo año 1974, el querellado

había iniciado otra relación profesional que tendría repercusiones en su práctica profesional. Veamos:

22. Resulta que allá para el año 1970 la joven Luz Nereida Rosario, recién graduada de Escuela Superior, y quien residía, en unión a sus padres, en el sector de Villa Palmeras, en Santurce, conoció a un joven nombrado José L. Alexandrino. Se hicieron novios poco tiempo después. Ella trabajaba de ayudante en un laboratorio. El residía en la Urbanización Ponce de León en Guaynabo.

23. Eventualmente Luz Nereida y José Luis comenzaron a sostener relaciones sexuales. Como resultado, ella quedó encinta. Cuando tenía varios meses de embarazo decidieron casarse. El matrimonio, en efecto, se celebró el 7 de julio de 1973. En septiembre de ese año Luz Nereida dio a luz una niña, a la cual nombraron Ramona Alexandrino Rosario.

24. Al tiempo de nacer la niña ya habían surgido serias desavenencias entre los cónyuges. No vivían juntos. Ella residía en Bayamón, donde ocasionalmente recibía la visita de su esposo. Con el paso del tiempo, la situación fue deteriorándose al extremo de que el esposo comenzó a insistir en la necesidad del divorcio. Luz Nereida tenía mucho cariño a su hija. Su esposo continuamente la amenazaba diciéndole que si no accedía a divorciarse, él la privaría de la custodia de la niña. La Sra. Rosario, eventualmente, accedió a poner fin a los problemas conyugales mediante el procedimiento de divorcio.

25. Así las cosas, en uno de los primeros días de enero de 1974, José Luis Alexandrino decidió obtener los servicios profesionales necesarios para el trámite judicial. En consecuencia, visitó las oficinas del querellado Carmelo Avila, Jr.

26. Durante la entrevista entre Alexandrino y el querellado éste informó a su visitante que, a base de los hechos que éste le había descrito, recomendaba que su esposa, y no él, iniciara los procedimientos de divorcio. Su consejo estaba fundado en que era ella, y no él, la que tenía una causal de divorcio a su favor. El abogado le sugirió, además, que trajera a su esposa a la oficina del letrado para recibir la necesaria orientación legal con respecto a los trámites de ley en este tipo de casos.

27. Días más tarde Alexandrino visitó a su esposa en Bayamón. La instó a que lo acompañara hasta las oficinas del licenciado Avila, Jr. para discutir los trámites del divorcio. Luz Nereida accedió.

Dejaron la niña al cuidado de una tía suya y se trasladaron en automóvil hasta las oficinas del querellado.

28. El Lcdo. Avila, Jr. se entrevistó con los cónyuges. Indicó a la Sra. Rosario que consideraba apropiado que fuese ella la que compareciera como demandante en el pleito de divorcio porque se vería 'feo' que fuese el esposo el que tuviera que comparecer a declarar y establecer la culpa de ella por la causal de trato cruel e injurias graves.

29. Precisa—en este momento—que el Comisionado suscribiente adjudique la controversia que surge de los testimonios aportados durante la audiencia con respecto al hecho crucial sobre si el querellado recomendó o no a la Sra. Rosario que omitiera, tanto en la demanda a radicarse como en su posterior testimonio en corte, el hecho de que los cónyuges habían procreado una niña durante el matrimonio.

La Sra. Rosario, al declarar durante la audiencia celebrada ante el suscribiente, afirmó que el querellado expresamente le indicó que 'dijera que no había niña, que cuando llegaran los papeles, él arreglaba los papeles para que apareciera la niña'. Continuó diciendo la declarante que el abogado querellado le indicó que no dijera nada sobre la niña porque de lo contrario había que ir a 'relaciones de familia' y José Luis tenía 'prisa'.

El querellado, por su parte, fue enfático en su afirmación al efecto de que en la ocasión en que se entrevistó con los esposos Alexandrino éstos nunca le informaron sobre la existencia de hijos en el matrimonio. Negó que hubiese recomendado a la Sra. Rosario que omitiera mencionar la existencia de la niña en su testimonio en corte o en la demanda que intentaba radicar. Por el contrario—afirmó el querellado—cuando él preguntó a la Sra. Rosario, durante la entrevista en su oficina, si había hijos o bienes gananciales en el matrimonio, ella contestó en la negativa.

El Comisionado suscribiente ha concluido que los hechos relacionados con la no inclusión de la menor Ramona Alexandrino Rosario en los documentos judiciales relacionados con el divorcio de sus padres ocurrieron en la forma en que los describió la señora Rosario al testificar durante la audiencia.

Nos mueve a hacer la anterior conclusión, en primer lugar, la manera directa, sencilla y ecuánime en que la señora Rosario prestó testimonio. Pudimos observar en ella una total ausencia de animosidad personal o encono hacia el querellado. En todo momento nos impresionó como persona que—obligada por las circunstancias—

deseaba relatar los hechos, tal como ella los recordaba, y reintegrarse tan pronto como fuese posible a sus ocupaciones habituales.

En segundo lugar, el examen de los documentos que fueron admitidos en evidencia durante la audiencia celebrada ante el suscribiente corrobora la versión de la señora Rosario. De ellos se desprende claramente que el querellado tuvo en todo momento absoluto control sobre todo el trámite procesal que culminó en la sentencia decretando el divorcio de los cónyuges. Obsérvese que tanto la Demanda como la Contestación a la misma fueron preparadas en la oficina del abogado querellado, utilizándose para ello la misma máquina de escribir. Es de notar, además, que el demandado José Luis Alexandrino a pesar de que hace constar en la Contestación a la Demanda que él suscribió, que comparece por derecho propio, utiliza en dicho escrito términos poco conocidos en el lenguaje común. Por ejemplo, el demandado acepta todos los hechos de la Demanda, incluyendo el relacionado con la ausencia de hijos en el matrimonio y renuncia a ser notificado de la fecha de la vista; a su derecho de apelación, revisión o certiorari; y acepta que la sentencia que se dicte sea firme desde la fecha de la misma.

La corroboración final, sin embargo, proviene del propio querellado. En la declaración jurada que prestó ante el Procurador General Auxiliar el 25 de enero de 1977, mientras se investigaban los pormenores de esta queja, el Lcdo. Avila, Jr. admitió que él redactó tanto la Demanda de Luz Nereida como la Contestación a la Demanda de Alexandrino; que hizo que éste compareciera por derecho propio y que fue este último quien pagó los honorarios profesionales del Divorcio, los cuales fluctuaron entre $175.00 y $200.00.

30. Lo cierto es que, luego de la entrevista con los esposos Alexandrino, el querellado radicó ante la Sala de Caguas del Tribunal Superior, la demanda de Divorcio de Luz Nereida Rosario contra José Luis Alexandrino. En las alegaciones se imputó al demandado trato cruel e injurias graves contra su esposa. En la demanda, radicada el 28 de enero de 1974 bajo el número 74-522, se expresó que los cónyuges no habían procreado hijos ni adquirido bienes gananciales durante el matrimonio.

Por su parte, el 31 de ese mismo mes y año, el demandado José Luis Alexandrino, suscribió la Contestación a la Demanda que le había preparado el querellado. En ella admitió la veracidad de todas las alegaciones pertinentes contenidas en la demanda, incluyendo el hecho de no haber procreado hijos durante el matrimonio.

Ese documento—antes de ser radicado en corte—fue autenticado por el demandado Alexandrino, quien compareció ante un Notario Público de San Juan y juró que era cierto todo lo que él afirmaba en la contestación a la Demanda que estaba suscribiendo.

31. Eventualmente, la Sra. Rosario compareció a declarar en Corte en el pleito de divorcio. La interrogó el querellado. A preguntas de éste se reafirmó en que no habían procreado hijos durante el matrimonio. El Tribunal, en consecuencia, dictó sentencia de divorcio el 11 de febrero de 1974. Desde luego, la corte no hizo pronunciamiento alguno sobre hijos o pensión alimenticia.

32. Luego que se dictó la Sentencia de Divorció el padre de la menor Ramona Alexandrino Rosario no se ocupó del sostenimiento económico de ésta. Con el transcurso del tiempo Luz Nereida comenzó las gestiones para lograr que un tribunal de justicia obligara al padre de la criatura a proveerle alimentos. Como consecuencia, mientras se investigaba una querella radicada por la madre de la niña ante el Tribunal de Distrito de Río Piedras, se descubrió el hecho de que en la Sentencia de Divorcio dictada por el Tribunal Superior de Caguas en el caso número 74-522 no se había hecho constar la obligación del padre para proveer alimentos a su menor hija. Los trámites subsiguientes culminaron en la radicación de una queja contra el querellado ante la Oficina del Procurador General.

## [III]

33. Finalmente, la prueba aportada durante la audiencia celebrada ante el suscribiente reveló la existencia de una tercera controversia relacionada directamente con el ejercicio de la profesión por parte del querellado Carmelo Avila, Jr.

34. Surge de esa prueba que en el mes de junio de 1974 visitó las oficinas del querellado un ciudadano nacido en Jordania, quien residía hacía algunos años en Puerto Rico. Se nombraba George Saba. A pesar de que el señor Saba se dedicaba al comercio en Puerto Rico no tenía el suficiente dominio de los idiomas español o inglés como para hacerse comprender en uno de esos idiomas. Por tanto, en esta primera visita, el señor Saba se hizo acompañar por un amigo suyo que practica la contabilidad en nuestro país, aun cuando no tiene licencia para ello.

35. El señor Saba y su acompañante indicaron al letrado Carmelo Avila, Jr. que interesaban iniciar los procedimientos judiciales correspondientes ante el Tribunal de los Estados Unidos

para Puerto Rico a fin de recibir la protección establecida en la Ley Federal de Quiebras.

36. Saba—o, más bien, su acompañante—explicó que él era un mayorista dedicado a la venta de mercancía seca. Había sido dueño de un local comercial, pero éste había sido destruido por un fuego. La compañía aseguradora del local estaba en disposición de reembolsarle una suma en exceso de $20,000.00 en compensación por las pérdidas sufridas durante el incendio. Por otro lado, contra Saba se habían radicado cuatro (4) demandas de cobro de dinero. Sus acreedores habían procedido a embargar el interés que Saba pudiera tener en su reclamación contra la compañía aseguradora del local. Saba estaba dispuesto a conceder al querellado la más amplia discreción para que éste tomara las medidas legales necesarias ante la Corte de Quiebras para proteger sus intereses económicos.

37. El querellado aceptó la encomienda de Saba. Radicó en el foro federal la solicitud que provee el Capítulo XI de la Ley Federal de Quiebras e inició las gestiones de rigor.

38. Luego de sucesivas primeras reuniones de acreedores, el querellado logró que la Corte de Quiebras, en 26 de noviembre de 1975, aprobara un plan de pago a los acreedores no asegurados que consistiría en que Saba les satisfaría el 65% del total de sus acreencias. El 15% del total lo pagaría Saba de inmediato y el 50% restante en un plazo no mayor de dos (2) años. La Corte, además, autorizó el deudor George Saba a recibir $21,161.68 más los intereses que dicha suma hubiese acumulado. Esta suma era el remanente de la cantidad depositada ante la Corte de Quiebras por la compañía aseguradora del local propiedad de Saba, en pago total de la reclamación de éste luego de deducirse $3,000.00 que fueron pagados al querellado por sus gestiones profesionales en el procedimiento de Quiebras y $1,512.79 que la corte autorizó para otros gastos.

39. Toda vez que las gestiones del letrado Avila, Jr. ante la Corte de Quiebras habían sido exitosas, Saba y el querellado acordaron que éste último se encargaría de todo el trámite conducente a pagar a los acreedores, de la suma que la compañía aseguradora había depositado en la Corte, y a la cual se ha hecho referencia, el 15% inicial correspondiente a los acreedores.

En ningún momento, sin embargo, se discutió entre Saba y el querellado el hecho de si éste tendría o no facultad para estampar la

firma de Saba en algún documento o cambiar algún cheque expedido a nombre de éste.

El 31 de diciembre de 1975, la Corte de Quiebras emitió una orden autorizando al deudor Saba a utilizar aquella parte de la suma de $21,361.42 (capital e intereses) depositada por la compañía aseguradora, para pagar a los acreedores concernidos el plazo inicial correspondiente al 15% de sus respectivas acreencias.

40. Así las cosas, el 15 de enero de 1976 la Secretaria de la Corte de Quiebras notificó al querellado Carmelo Avila, Jr. que el cheque por la suma de $21,361.42, expedido a nombre de Saba y de su abogado, estaba a disposición de su cliente en la Secretaría de la Corte. El querellado pidió entonces a dicha funcionaria que le entregara el cheque y ésta así lo hizo.

41. Al siguiente día el querellado se personó al Chase Manhattan Bank a eso de las 9:00 de la mañana. Llevaba consigo el cheque de su cliente y una lista conteniendo el nombre de acreedores que habían comparecido a la Corte de Quiebras dentro del procedimiento de reorganización solicitado por George Saba. Cambió el cheque de su cliente en el Banco y pidió al Gerente que se expidieran varios cheques a nombre de los acreedores de Saba por un total de $6,016.06.

42. La suma restante, o sea $15,345.36, le fue entregada, en efectivo, al abogado querellado Carmelo Avila, Jr. Éste echó el dinero en un sobre de tamaño legal y se encaminó a su oficina. Esa misma mañana—declaró el querellado—recibió una llamada requiriendo su presencia en la República Dominicana. En consecuencia, abordó, al mediodía, un avión y se encaminó hacia la vecina República. Llevó consigo todo el dinero de Saba. Cuando regresó a Puerto Rico a la semana siguiente, luego de terminar su estadía en Santo Domingo, el querellado pudo notar que no tenía en su poder ni un sólo centavo de la suma de dinero propiedad de Saba, que había llevado consigo.

43. George Saba nada sabía de lo que había acontecido con su dinero. Eventualmente visitó las oficinas del abogado querellado y éste le informó que, en efecto, había retirado de la Corte el dinero correspondiente a su cliente pero que se le había extraviado en Santo Domingo.

44. Saba inició de inmediato las correspondientes gestiones para que el querellado le reembolsara el dinero de su propiedad.

Visitó las oficinas de un magistrado federal. En presencia de éste el querellado prometió que le pagaría el total de la suma retenida en plazos periódicos. En 26 de febrero de 1976 Saba recibió del querellado la suma de $2,000.00 y una serie de cheques postdatados para ser presentados al cobro mensualmente. En esta forma el querellado intentaba reembolsar a Saba la suma de dinero propiedad de éste. Saba, sin embargo, no pudo cobrar los cheques en la fecha que los mismos indicaban porque el querellado tuvo dificultades económicas que le imposibilitaron depositar en el Banco las sumas necesarias para cubrir el importe de los cheques.

45. En el mes de septiembre de 1976 el querellado se enteró que algunos acreedores adicionales de Saba, los cuales no habían recibido el 15% de sus acreencias, habían radicado sus reclamaciones en la Corte de Quiebras. El querellado efectivamente había pagado a algunos acreedores en 26 de febrero de 1976 la suma de $6,016.06 que había retirado del Banco el 16 de enero de 1976. Sin embargo, como los acreedores adicionales no estaban incluidos en la orden original de la corte se vio precisado a depositar la suma adicional de $2,647.12 en la Corte de Quiebras para satisfacer estas nuevas acreencias. Este depósito lo hizo el querellado el 29 de septiembre de 1976.

46. Mientras tanto Saba continuaba haciendo gestiones ante diversos organismos gubernamentales para recobrar su dinero. Radicó quejas en las oficinas del Colegio de Abogados de Puerto Rico y ante el Procurador General. Al propio tiempo contrató los servicios profesionales del Lcdo. Adolfo de Castro para que iniciara las gestiones legales necesarias para que el querellado le reembolsara su dinero.

El 9 de junio de 1977, luego de la investigación de rigor, el Procurador General radicó su informe ante el Tribunal Supremo exponiendo ante esa Superioridad el resultado de la investigación relacionada con la conducta profesional del querellado.

El 22 de julio de 1977, el querellado, el Lcdo. De Castro y George Saba llegaron a un acuerdo que puso fin a la controversia relacionada con la retención del dinero de Saba. Ese día suscribieron y radicaron ante la Corte de Quiebras una Moción Informativa, dentro del procedimiento iniciado por George Saba bajo el Capítulo XI de la Ley Federal de Quiebras, indicando que los comparecientes habían llegado a un acuerdo satisfactorio. Expresa el documento que de los $21,361.42 propiedad de Saba que el Lic. Avila, Jr. había retirado de la

Corte, éste había reembolsado a Saba $2,000.00 en 26 de febrero de 1976 y que ese mismo día había pagado a los acreedores $6,016.06. Que, además, había hecho otro pago a acreedores adicionales, por la suma de $2,647.12 el 29 de septiembre de 1976 y había cobrado para sí la suma de $1,698.20 en concepto de honorarios profesionales, por los servicios legales prestados a Saba en el procedimiento de Quiebras con posterioridad al 26 de noviembre de 1975. El documento termina expresando que de los restantes $9,000.00, el Lcdo. De Castro recibiría $1,000.00 por sus gestiones de recobro de dinero y George Saba recibiría un cheque oficial por $8,000.00.

47. La evidencia aportada durante la audiencia indicó que, en la actualidad, no existe animosidad personal o rencor alguno de parte de Saba hacia el Lic. Avila, Jr.. Precisa mencionar, sin embargo, para una adecuada comprensión de los hechos pertinentes que, mientras prestaba testimonio durante la audiencia ante el suscribiente, Saba repetidamente declaró que, aun cuando él estaba satisfecho con el acuerdo de reembolso de dinero, él entendía que el querellado nunca le había devuelto la totalidad de la suma retenida porque existía una diferencia de aproximadamente $2,000.00 entre lo que el querellado debía devolver y lo que efectivamente había reembolsado.

A juicio del suscribiente, la discrepancia entre la versión de Saba y la del letrado querellado—quien afirmó repetidamente que él no adeuda suma de dinero alguna a su cliente—consiste en la partida de $1,698.20 que aparece en la Moción Informativa radicada ante la Corte de Quiebras como 'honorarios por servicios legales prestados y a ser prestados por el querellado' a Saba en el procedimiento de Quiebras. La génesis de este mal entendido radica en que no se explicó adecuadamente a Saba, al suscribirse el documento contentivo del acuerdo, la naturaleza de las gestiones profesionales que el querellado realizó dentro del procedimiento de Quiebras, a partir del 26 de noviembre de 1975. Hemos descrito en el presente Informe las gestiones profesionales que, de acuerdo con la prueba aportada, el querellado llevó a cabo dentro de aquel procedimiento antes y después de la mencionada fecha." [Escolios omitidos.]

Las determinaciones de hechos transcritas reflejan indubitadamente que el querellado Carmelo Ávila, Jr., incurrió en serias infracciones a varios cánones del Código de Ética Profesional aprobado en 24 de diciembre de 1970. 99 D.P.R. 997.

■ Respecto al primer cargo, ciertamente violó el Canon 20 (¹) ya que fue negligente con relación al trámite de renuncia de la Sra. Amparo M. Camerón en ocasión de haberse interpuesto un recurso de revisión ante este Tribunal. El canon es específico en cuanto a las medidas que debe adoptar todo abogado para no dejar en estado de indefensión a un representado y no causar dilación a los procesos en los tribunales. Los deberes particulares consignados no excluyen otros consustanciales que necesariamente dependerán de las circunstancias especiales en cada caso.

■ Al no convenirse el pago de honorarios solicitados por el querellado como requisito para representarla ante este Tribunal, debió formular por escrito su renuncia y pedirle permiso al tribunal, ello a tono con la creencia *subjetiva* de que no era ya su abogado. Su conducta es altamente censurable y conflige con la buena ética. *In re Coll*, 101 D.P.R. 799 (1973).

■ En lo concerniente al segundo cargo, su gravedad es manifiesta. Deliberadamente el querellado aconsejó e indujo a su representada Sra. Rosario que ocultara la existencia de una hija en los trámites de divorcio. Más aún, ocultó a sabiendas al redactar la demanda tal hecho conociendo las

---

(¹) Reza:

*"Canon 20.—Renuncia de Representación Legal*

"Cuando el abogado haya comparecido ante un tribunal en representación de un cliente no puede ni debe renunciar la representación profesional de su cliente sin obtener primero el permiso del tribunal y debe solicitarlo solamente cuando exista una razón justificada e imprevista para ello.

"Antes de renunciar la representación de su cliente el abogado debe tomar aquellas medidas razonables que eviten perjuicio a los derechos de su cliente tales como notificar de ello al cliente; aconsejarle debidamente sobre la necesidad de una nueva representación legal cuando ello sea necesario; concederle tiempo para conseguir una nueva representación legal; aconsejarle sobre la fecha límite de cualquier término de ley que pueda afectar su causa de acción o para la radicación de cualquier escrito que le pueda favorecer; y el cumplimiento de cualquier otra disposición legal del tribunal al respecto, incluyendo la notificación al tribunal de la última dirección conocida de su representado.

"Al ser efectiva la renuncia del abogado debe hacerle entrega del expediente a su cliente y de todo documento relacionado con el caso y reembolsar inmediatamente cualquier cantidad adelantada que le haya sido pagada en honorarios por servicios que no se han prestado."

consecuencias. Este comportamiento constituye una crasa violación a los Cánones 8, 26 y 35. ([2]) *In re Cruz Disdier*, 70 D.P.R. 453 (1949).

■ Y, finalmente, el querellado violentó el Canon 23, ([3]) abusó de la confianza que depositara en él su cliente

---

([2]) Disponen respectivamente:

*"Canon 8.—Actos Impropios de los Clientes*

"El abogado no debe permitir que sus clientes, en el trámite de los asuntos que crean la relación de abogado y cliente, incurra en conducta que sería impropia del abogado si él la llevase a cabo personalmente. Esta norma tendrá particular aplicación en lo referente a las relaciones con los tribunales, los funcionarios judiciales, los jurados, los testigos y las otras partes litigantes. Cuando un cliente persista en incurrir en tal conducta impropia, el abogado debe terminar con él sus relaciones profesionales."

*"Canon 26.—Derechos y Limitaciones en Relación con Clientes*

"Ningún abogado está obligado a representar a determinado cliente y es su derecho el aceptar o rechazar una representación profesional. Es altamente impropio aconsejar transacciones o actos en contra de la ley, entablar pleitos viciosos, instigar falsas defensas sin que pueda el abogado justificar dichos actos con el pretexto de que al actuar así, lo hizo siguiendo las instrucciones de su cliente. El abogado debe obedecer siempre su propia conciencia y no la de su cliente."

*"Canon 35.—Sinceridad y Honradez*

"La conducta de cualquier miembro de la profesión legal ante los tribunales, para con sus representados y en las relaciones con sus compañeros debe ser sincera y honrada.

"No es sincero ni honrado el utilizar medios que sean inconsistentes con la verdad ni se debe inducir al juzgador a error utilizando artificios o una falsa relación de los hechos o del derecho. Es impropio variar o distorsionar las citas jurídicas, suprimir parte de ellas para transmitir una idea contraria a la que el verdadero contexto establece u ocultar alguna que le es conocida.

"El abogado debe ajustarse a la sinceridad de los hechos al examinar los testigos, al redactar *affidavits* u otros documentos, y al presentar causas. El destruir evidencia documental o facilitar la desaparición de evidencia testifical en un caso es también altamente reprochable."

([3]) *"Canon 23.—Adquisición de Intereses en Litigio y Manejo de los Bienes del Cliente*

"El abogado no debe adquirir interés o participación alguna en el asunto en litigio que le haya sido encomendado.

"Un abogado no debe adelantar o prometer ayuda financiera a su cliente para gastos médicos o subsistencia, excepto que puede adelantar el pago de las costas del litigio, y los gastos de investigación y de exámenes médicos necesarios para representar debidamente el caso de su cliente.

"La naturaleza fiduciaria de las relaciones entre abogado y cliente exige que éstas estén fundadas en la honradez absoluta. En particular, debe darse pronta cuenta del dinero u otros bienes del cliente, que vengan a su posesión y no debe mezclarlos con sus propios bienes ni permitir que se mezclen."

Sr. George Saba al disponer impropiamente de varias sumas de dinero pertenecientes a éste, contrario a lo dispuesto en el referido canon. *In re Castro Figueroa*, 96 D.P.R. 317 (1968). Como dijimos en *In re Guzmán*, 82 D.P.R. 235, 240 (1961):

"El canon . . . dispone que el abogado debe dar cuenta pronto de dinero del cliente que venga a sus manos, y que debe evitar que los fondos del cliente se confundan con sus bienes propios, sin el consentimiento y conocimiento de aquél. Esta norma de conducta responde a la necesidad de que las relaciones entre abogado y cliente estén fundadas en la honradez absoluta. Nada contribuye tanto a afectar adversamente la reputación de la profesión legal en la comunidad como situaciones similares a la que consideramos . . . .

Y la fe y la confianza del pueblo es esencial para que el abogado pueda cumplir cabalmente la función que le corresponde en nuestra sociedad. Es por·eso que no podemos dejar de sancionar rigurosamente los actos realizados por el querellado en este caso. El Juez Presidente Vanderbilt de Nueva Jersey ha expresado que 'Los fondos de un cliente en poder de su abogado deben permanecer intocados. Por razones obvias, en estos casos se aplican las normas más estrictas de conducta y toda presunción es desfavorable a quien utiliza los fondos en forma no autorizada." (Citas omitidas.)

*La gravedad de las actuaciones del querellado Carmelo Ávila, Jr., justifica se dicte sentencia decretando su separación del ejercicio de la profesión de abogado-notario en Puerto Rico.*

El Juez Presidente Señor Trías Monge y el Juez Asociado Señor Rigau se inhibieron.